IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 3, 2016

**DANNY R. MAYS v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Madison County**
**No. C-14-164        Donald H. Allen, Judge**
_____

**No. W2015-02237-CCA-R3-PC  -  Filed September 9, 2016**
_____

The petitioner, Danny R. Mays, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received effective assistance of counsel at trial and on direct appeal. After our review of the record, briefs, and applicable law, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined. CAMILLE R. MCMULLEN, J., concurring in results only.

G.W. Sherrod, III, Henderson, Tennessee, for the Defendant-Appellant, Danny R. Mays.

Herbert H. Slattery, III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Jerry Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**FACTS**

In 2010, the petitioner's failure to comply with a traffic stop, and the events that followed, led a Madison County jury to convict him of felony evading arrest, reckless driving, driving on a cancelled, suspended or revoked license, leaving the scene of an accident, violation of the registration law, criminal trespass, vandalism, and possession of marijuana. The trial court sentenced the petitioner to eight years in confinement for the combined offenses. On direct appeal, this Court affirmed the petitioner's convictions

-1-

after thoroughly reviewing the evidence produced at trial. The Court summarized the facts as follows:

> This case arises from a traffic stop of a vehicle driven by the [petitioner] that occurred on November 23, 2010, at 8:25 a.m. As a result of events that occurred after the stop, a Madison County grand jury indicted the [petitioner] for felony evading arrest, reckless driving, driving on a cancelled, suspended or revoked license, leaving the scene of an accident, violation of the registration law, criminal trespass, vandalism, and possession of marijuana. At the [petitioner's] trial on these charges, the parties presented the following evidence: Joseph Williams, an officer with the Jackson Police Department, testified that he was part of the "street crimes unit" and, as such, he was typically dressed in uniform and in a marked patrol car when he was on duty. He said that on November 23, 2010, at approximately 8:25 a.m., he saw a white Chevrolet Caprice, 1991 or 1992 model, with a vehicle tag number 380 XXL. He put the tag number into his patrol unit's computer to check the tag through "NCIC." The tag returned as being registered to a 2002 Saturn. Based upon this information, Officer Williams initiated a traffic stop.

> Officer Williams testified that, after he activated his lights, the vehicle's driver did not immediately pull over and stop, continuing southbound. Officer Williams said that the driver did not increase his speed but failed to pull over. Officer Williams activated his sirens and, as the two vehicles approached an intersection, the driver increased his speed "highly" to approximately fifty miles per hour and ran the stop sign at the intersection. The driver then slightly slowed down at a red light and turned right, which was westbound. Officer Williams testified that the driver did not stop and did not have time to check for oncoming cars.

> Officer Williams testified that he continued to pursue the driver, whose speed reached greater than seventy miles per hour. The officer, who was on the police radio with his supervisor, relayed the events as they were occurring to his supervisor. His supervisor advised him, because of the speed and the traffic, to "disengage the pursuit." Officer Williams complied with the order immediately. Officer Williams explained that disengaging meant that he turned off his lights and siren and reduced his speed, following all traffic laws. He said that, as he disengaged, the vehicles were approaching the Highway 45 bypass. There was a red light at the intersection, and the driver of the vehicle, traveling at a high rate of speed, continued through the intersection, nearly striking a vehicle turning

northbound head-on. When avoiding the head-on collision, the driver nearly lost control of the vehicle but was able to regain control. The officer followed the driver, driving a normal rate of speed and without his lights and sirens activated, until the driver sped out of his view. He estimated that the driver was traveling at 100 miles per hour when he lost sight of him.

Officer Williams said that, a short time after he lost sight of the driver and was returning to his normal duties, he received a radio call from his supervisor advising him that the Sheriff's Department had encountered the same vehicle. Officer Williams was directed to provide the state troopers the "county" and the tag number. Officer Williams was still in the area and saw the vehicle traveling at a high rate of speed back "into town." The driver was speeding toward the officer at around sixty to seventy miles per hour. Officer Williams pulled over to the side of the road and, after the driver passed, he made a U-turn and reinitiated pursuit with his lights and sirens activated.

Officer Williams testified that, during the pursuit, the traffic was "heavy." The driver went through several intersections and then began driving southbound in the northbound lane. The officer observed "cars going in every direction attempting to avoid this vehicle from being struck head-on by this vehicle at a high rate of speed." Vehicles were moving left and right, getting into the median and emergency lane to avoid a collision. Officer Williams saw one vehicle drive into a ditch between the two lanes and spin around two or three times in an attempt to avoid being struck head-on.

Officer Williams said that he pursued the vehicle toward downtown and that he followed the vehicle as it traveled into the appropriate lane of travel. At this point, two sheriff's deputies joined in the pursuit. Officer Williams said he maintained contact with dispatch to inform them of his path of travel. Sergeant Whitman, who was in the downtown area, was attempting to discern the lane of travel of the vehicles so that he could set out spikes in an attempt to deflate the tires of the driver's vehicle. Officer Williams received information from Sergeant Whitman that the driver's vehicle had collided with his patrol car, and Sergeant Whitman was joining the pursuit. Officer Williams said that Sergeant Whitman was the lead vehicle at this point and that Officer Williams was the third or fourth car in pursuit.

Officer Williams recalled that Sergeant Whitman radioed that the driver had exited his vehicle and was fleeing on foot. The officer arrived at the

scene and saw the driver's vehicle with the door open, off the side of the road up on on [sic] a little hill where it had rolled off the road. Officer Williams drove past the vehicle and on to another street in an attempt to cut off the driver. Sergeant Whitman then radioed and advised him that the [sic] had last seen the driver at 210 McCowat Street. Officer Williams traveled the short distance to that address, which appeared to be a single family residence, and he immediately set up a perimeter. The officer noted that there was broken glass on the rear door of the address, and he advised the other officers engaged in the pursuit. Officer Whitman secured the back door, and Officer Williams went to the front of the house, where he observed other officers speaking with someone who had answered their knock. Officer Williams returned to the back door, and he and Officer Whitman looked inside the back door. They saw the driver attempting to conceal himself by lying down between a number of items that were in the room.

Officer Williams said that he gave the driver commands to "stand up," and the driver ignored those commands, continuing to lie on the floor. The officers entered the room and forcibly took the driver into custody. The officer then identified the [petitioner] as the driver of the vehicle that he pursued on that occasion. Officer Williams recalled that the [petitioner's] arms and hands were bleeding. Officer Williams transported the [petitioner] to the officer's patrol car, where he obtained the [petitioner's] Tennessee State Identification card, which listed the [petitioner's] name and date of birth.

Officer Williams testified that he put the [petitioner's] information into his computer and determined that the [petitioner's] driver's license had been revoked. The State offered a certified copy of the [petitioner's] driving history, which confirmed that his driver's license had been revoked at the time of his arrest. The officer also determined that the license tag on the [petitioner's] vehicle was registered to a different vehicle that was owned by a different person.

During cross-examination, Officer Williams testified that he did not search the vehicle after the [petitioner] fled. He conceded that there could have been someone else in the vehicle who could have ducked behind the seat as he was pursuing the [petitioner]. He did not, however, believe this to be the case. The officer said that Sergeant Whitman was the first person on the scene where the vehicle was located because he was the officer pursuing the vehicle at that time. Officer Williams denied recalling that he had

testified differently in any other proceedings. Officer Williams said he did not personally observe the [petitioner] exit the vehicle. Further, he said that, during the pursuit, he was only able to identify the [petitioner] as an "African–American male" and was unable to observe anything else about him until he saw the [petitioner] in the residence at 210 McCowat Street.

Officer Williams testified that the vehicle was later secured and photographed, and officers determined by the vehicle identification number that the vehicle was not stolen. They conducted no further investigation into the owner of the Saturn to which the vehicle's license plates belong. The officer conceded that his testimony that the driver exceeded speeds of one hundred miles per hour was based upon his personal estimation. Officer Williams agreed that, once the [petitioner] was arrested, police ceased searching for any other suspects. During redirect examination, Officer Williams identified photographs of the vehicle at the scene where it was abandoned, and he noted that only the driver's side front door was open. The officer testified that Officer Arnold with the Jackson Police Department took these photographs. During re-cross-examination, Officer Williams conceded that he did not know how long after the [petitioner] was apprehended that the photographs were taken.

Jefferey Tullos, a Sergeant with the Madison County Sheriff's office, testified that, on November 23, 2010, he was traveling away from downtown Jackson when he noticed a "city unit," with its lights and sirens activated, following a white Chevrolet Caprice. The vehicle was approaching an intersection, with the police car following closely behind, and then turned and headed toward the "bypass." Sergeant Tullos joined the pursuit. Shortly after that, the city police officer disengaged the pursuit, and the Caprice proceeded west. When the city police officer stopped pursuit, Sergeant Tullos also ended his pursuit of the vehicle. Sergeant Tullos testified that the vehicle was traveling in excess of the speed limit, but he could not estimate the vehicle's speed.

Sergeant Tullos testified that he next saw the vehicle stopped in traffic. The vehicle, which had only one occupant, proceeded through the intersection against the light headed toward downtown. The Sergeant activated his lights and sirens and again began to pursue the vehicle. The vehicle then entered the northbound lane, traveling south against the flow of traffic. Sergeant Tullos observed several vehicles swerving out of the path of the vehicle, one of which proceeded into the median. Sergeant Tullos slowed down his rate of speed to ensure there were no major accidents and that no

one was injured. The Sergeant said he lost sight of the vehicle, which was still being pursued by other officers.

Sergeant Tullos said that the next time he saw the vehicle it was stopped, and the occupant of the vehicle had exited. The sergeant followed some of the city officers toward McCowat Street and there met Sergeant Whitman, who stated he had found a broken window at the back door of 210 McCowat Street. The Sergeant testified that he assisted in apprehending the [petitioner], who was lying on the floor under some debris in the utility room at the rear of the house.

During cross-examination, Sergeant Tullos testified that he was, at one point, only one car length from the vehicle during the pursuit. The sergeant agreed that no cars were damaged when the vehicle traveled south in the northbound lane. Sergeant Tullos agreed that he did not see the [petitioner] exit his vehicle. During redirect examination, Sergeant Tullos testified that the [petitioner] appeared similar to the person that he saw driving the Caprice.

Phillip Whitman, a sergeant with the Jackson Police Department, testified that he became aware of this pursuit by radio, and he learned that the pursuit was headed his direction. He then observed a white "Chevy" being pursued by a deputy. Sergeant Whitman testified that he decided to attempt to terminate the pursuit, but he "missed [his] opportunity." [sic] He explained that, as the vehicle approached, he attempted to hit the vehicle with his patrol car. The sergeant hit the vehicle in the left quarter panel between the rear tire and the trunk area, resulting in only a glancing blow. The vehicle "fishtailed" and continued on.

Sergeant Whitman testified that he joined the pursuit, which was headed through the downtown area of Jackson. Sergeant Whitman noted that the driver "blew through every intersection it came to." After pursuing for a short distance, Sergeant Whitman observed the driver of the vehicle jump out of the vehicle, leaving it in gear. As the vehicle ran into a light pole, Sergeant Whitman observed the driver, noting he was an African American male wearing black jeans, a white t-shirt, a black hooded jacket, and white tennis shoes with green soles. In his car, Sergeant Williams followed the fleeing driver through an alley. When he saw Officer Williams, who indicated that he had not yet seen the driver, Sergeant Whitman believed the driver was located in the area of the two houses between the alley and the street.

Sergeant Whitman testified that he and Officer Williams made a "sweep" of the area, and they noted broken glass on an exterior door of a home. It appeared that someone had broken the glass, and then reached around and unlocked the door. Sergeant Whitman said that, when he looked inside the residence, he saw the [petitioner], wearing the white tennis shoes with green soles, lying on the floor. Officers took the [petitioner] into custody, and Sergeant Whitman noted that the [petitioner] was no longer wearing a black hoodie jacket. The sergeant said that other officers located the jacket near a fence close to the scene.

During cross-examination, Sergeant Whitman testified that he was unsure whether anyone took fingerprints or DNA samples from the vehicle. The sergeant said that he did not participate any further in investigating this case.

Phillip Kemper, a sergeant with the Jackson Police Department, testified that he was working on November 23, 2010, when he heard that there was a police pursuit that involved the Jackson Police Department and the Madison County Sheriff's Department. Sergeant Kemper was not involved in the pursuit, but he responded later to the McCowat Street address. When he arrived, the other officers had isolated the house that they believed the driver had entered. There was a K–9 officer present, and the dog was trying to track the path the driver had taken. Sergeant Kemper went into the backyard of the residence where a black jacket was found. Inside the jacket, Sergeant Keper [sic] found a "Swisher Sweet's [cigar] box." He opened the box and found it contained a marijuana "joint." The sergeant notified the patrol officer who was taking the pictures and collecting evidence, and the officer came and photographed and collected the jacket and the box.

During cross-examination, Sergeant Kemper testified that he looked around the fence in the area where the jacket was found. He could not recall if there was a hole in the fence, but he said that the fence did not appear to be damaged. The sergeant agreed he picked up the jacket before it was photographed, but he said he did not transport the jacket anywhere and instead only checked the pockets.

Edward McMullen, an officer with the Jackson Police Department, testified that he was working on November 23, 2010, when he was made aware of the pursuit of the white Chevrolet Caprice in this case. He said that he was not involved in the pursuit but that he headed in the general direction to

offer assistance. When the pursuit ended, and the driver fled on foot, Officer McMullen assisted in establishing a perimeter around the area where the driver was thought to have fled. Officer McMullen said that he went to the house where Sergeant Whitman was located in the backyard. Sergeant Whitman indicated that Officer McMullen should go to the front of the house. An African–American man came to the front door. Officer McMullen spoke with the man, who said that he and his mother lived there. Officer McMullen talked to the two residents, informing them about the investigation.

Officer McMullen testified that he then went around to the back of the home to tell Sergeant Whitman that there was a man and a woman in the house. Sergeant Whitman silently motioned to Officer McMullen that he had seen the suspect and told him to ask the residents if there was broken glass on their back door. Officer McMullen returned to the front of the home, asked the residents about the door, and was informed that there should not be any broken glass. Officer McMullen then instructed the two residents to exit the house for their own safety. Officer McMullen and a deputy entered the front of the home and heard other officers taking someone into custody. Officer McMullen explained he heard the officers yelling, "Let me see your hands." By the time Officer McMullen was able to walk downstairs to the back of the home, the [petitioner] was in custody.

Officer McMullen testified that his only other involvement in this case was to take photographs of the damage to the house where the [petitioner] was found hiding and a jacket located near the house. Officer McMullen also photographed a marijuana cigar that Sergeant Kemp [sic] had found in the jacket pocket.

During cross-examination, Officer McMullen testified that he did not recall Officer Kemper saying that he had moved the jacket before Officer McMullen photographed it. He said that he did not personally recall that the [petitioner] was wearing green-soled tennis shoes, but he recalled this fact being discussed on the police radio. Officer McMullen recalled that the two residents of the house informed him that there was no one else present in the home. He said that they were "rattled" when he informed them that someone had entered their home from the back porch.

Betty Puryears, a resident of 210 McCowat Street, testified that police officers came to her home on November 23, 2010, while she and her son, who lived with her, were at home. She recalled that, before officers entered

her residence, she and her son were watching them from her window. She said that there were police "cars everywhere" and officers running up and down the street. An officer came to her door and asked who lived in the home. She told the officer that she and her son, who was standing with her, were the only two people who lived there. Ms. Puryears testified that she did not know that there was someone in their home. Officers brought the man to the living room, and Ms. Puryears identified the [petitioner] as the man who had been in her home that day. She said she did not know the [petitioner], and she had not given him permission to be in her house that day.

Ms. Puryears testified that, as a result of this incident, the glass in her back door was broken, and her washing machine, which was located in the utility room, was also broken. Her landlord repaired the glass in the door, but she was required to replace her washing machine, which cost her approximately $390.

During cross-examination, Ms. Puryears testified that she did not know how much time elapsed between the time the [petitioner] entered her home and when he was apprehended by police. Ms. Puryears said that there was a fence in part of her backyard and that she did not recall it having any holes in it.

Brenda McNeil, an evidence technician for the Jackson Madison County Metro Narcotics Unit, testified that she received the drug evidence in this case. She took this evidence to the Memphis Tennessee Bureau of Investigation crime laboratory for testing. After it was tested, she transported the evidence back to her facility.

Shalandus Harris, a Special Agent Forensic ("TBI") Scientist with the TBI, testified that the evidence submitted to her was a hand-rolled cigar. Agent Harris tested the material inside the cigar and determined it was marijuana. During cross-examination, she agreed she did not weigh the marijuana, and she could not testify about how much marijuana the cigar contained.

The State entered a certified copy of the vehicle registration of license plate 380 XXL.

The [petitioner] recalled Sergeant Williams, who reiterated that Sergeant Whitman was the lead vehicle in the pursuit at the time the driver fled from the white Caprice. Sergeant Whitman was, therefore, the one who saw the

driver leave his vehicle. Sergeant Williams said he did not recall being asked that question previously at a different hearing.

Based upon this evidence, the jury convicted the [petitioner] of felony evading arrest, reckless driving, driving on a cancelled, suspended or revoked license, leaving the scene of an accident, violation of the registration law, criminal trespass, vandalism, and possession of marijuana. The trial court sentenced him to an effective sentence of eight years.

*State v. Mays*, No. W2013-01052-CCA-R3CD, 2014 WL 1669858, at *1-7 (Tenn. Crim. App. Apr. 24, 2014).

The petitioner retained private counsel to represent him at trial, while appointed counsel represented him on direct appeal. After the direct appeal, the petitioner filed a *pro se* petition for post-conviction relief. The circuit court then appointed counsel to represent the petitioner in the present case. After the appointment, the petitioner filed an amended petition for post-conviction relief alleging ineffective assistance of trial and appellate counsel. The petitioner generally alleged both trial and appellate counsel failed to effectively communicate with him or to file necessary motions on his behalf.

Specifically, the petitioner alleged trial counsel: (1) failed to file a motion to suppress evidence of the jacket and cigar box found at the arrest scene; (2) failed to challenge the chain of custody of evidence tested by TBI; (3) failed to object to the identification of the petitioner by certain witnesses; (4) failed to hold the State to its burden of proof at trial; (5) failed to introduce certain vehicle license and registration evidence; (6) failed to file a Notice of Mitigating Factors at sentencing; (7) failed to receive and/or communicate a notice of enhancement factors with the petitioner before sentencing; (8) failed to enter or require certified copies of prior judgments at sentencing; (9) failed to raise issues regarding language in the indictment; (10) failed to investigate legal and factual issues of merit relating to the petitioner's case; and (11) failed to timely file a Motion for New Trial. In addition, the petitioner alleged trial counsel was intoxicated at trial and that both trial and appellate counsel failed to properly challenge the consecutive sentences imposed by the trial court. Finally, the petitioner alleges appellate counsel failed to raise an ineffective assistance of counsel claim in both the Motion for New Trial and on direct appeal.

Both the petitioner and appellate counsel testified at the post-conviction evidentiary hearing. Trial counsel did not testify. Though the testimony was lacking, the petitioner stated he met with trial counsel twice before trial, he did not notify the trial judge of the suspected intoxication of trial counsel, and the jacket found at the scene of

-10-

the arrest was not his. Additionally, appellate counsel testified that he and the petitioner mutually agreed to file an ineffective assistance of counsel claim after the direct appeal.

After the evidentiary hearing, the post-conviction court conducted a thorough review of the record and entered an order denying post-conviction relief. The court found the petitioner failed to prove ineffective assistance of both trial and appellate counsel by clear and convincing evidence. The court held trial counsel filed pre-trial motions on behalf of the petitioner and his performance was "within the range of competence demanded of attorneys representing defendants in criminal cases." The court held appellate counsel properly filed a Motion for New Trial and a direct appeal on behalf of the petitioner. Thus, the court held the petitioner failed to show counsels' performance prejudiced his proceedings and the petition for post-conviction relief was denied in full. This appeal followed.

## ANALYSIS

The petitioner argues he received ineffective assistance of counsel alleging numerous deficiencies on behalf of both trial and appellate counsel. The petitioner bears the burden of proving his post-conviction allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40–30–110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State,* 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *See Henley v. State,* 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State,* 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *See Fields v. State,* 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *See Fields,* 40 S.W.3d at 458; *Burns v. State,* 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsels' performance was deficient and that counsels' deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington,* 466 U.S. 668, 687 (1984); *see State v. Taylor,* 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient

-11-

performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State,* 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland,* 466 U.S. at 688; *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. 466 U.S. at 687. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697; *see also Goad,* 938 S.W.2d at 370 (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

On appeal, the petitioner has failed to present any evidence showing counsels' alleged deficient performance prejudiced the outcome of the proceedings. *Strickland,* 466 U.S. at 687. In support of his claim, the petitioner merely recites the deficiencies alleged in his petition and summarizes the proceedings of the post-conviction hearing. At the hearing, however, the petitioner failed to elicit any evidence to demonstrate a reasonable probability that the alleged deficiencies prejudiced the proceedings. *Id.* at 694. Rather, the evidence produced at the hearing established that many of the alleged deficiencies were cured through the direct appeal process and that several of the alleged deficiencies were lacking in sufficient legal grounds. Based upon the evidence presented on appeal and in the record, the petitioner cannot succeed under *Strickland*. 466 U.S. at 687.

For example, the petitioner claims trial counsel should have filed a motion to suppress evidence of the jacket and marijuana found at the arrest scene. However, the petitioner denied ownership of the jacket at the evidentiary hearing.[1] As a result, the petitioner had no standing to file a motion to suppress the jacket and marijuana evidence. *See Bowman v. State*, 362 S.W.2d 255, 257 (1962) (citations omitted) (holding: "It is the

---

[1]The marijuana at issue was found inside of the jacket.

general law of this State that when one disclaims interest in the premises or possessions searched or in the articles seized he cannot question the legality of the search and seizure and it necessarily follows there can be no valid objection to evidence obtained by such search."). Accordingly, no evidence exists to support that trial counsel was ineffective as to the jacket and marijuana evidence and the petitioner cannot prove any resulting prejudice based on this alleged deficiency.

The petitioner also claims that trial counsel was intoxicated during trial. However, the petitioner did not discuss any concerns as to the suspected intoxication of trial counsel with the trial judge and he failed to call trial counsel at the post-conviction hearing. The burden is on the petitioner to present clear and convincing evidence of his post-conviction allegations, a failure to do so precludes the petitioner from meeting his burden. *See* Tenn. Code Ann. § 40–30–110(f); *Goad*, 938 S.W.2d at 369. The only evidence supporting this allegation is the petitioner's testimony that trial counsel "was sweating a whole lot" during trial. The post-conviction court found that the petitioner failed to establish trial counsel was intoxicated during trial. We agree. As a result, the petitioner cannot prove that he was prejudiced by trial counsel's alleged intoxication.

The post-conviction court also addressed the petitioner's general claim that trial counsel failed to file "necessary motions" on his behalf. The court outlined its review of pertinent actions taken by trial counsel on behalf of the petitioner in a letter to counsel.[2] The post-conviction court explained:

Furthermore, it appears to the Court based upon a careful review of the Court file and record, that [trial counsel] did in fact file a Motion on November 4, 2011, being a "Request for Discovery, Inspection (of the State's file) and Notice of Intent to Use Evidence." It appears that the State complied with the [petitioner's] request for discovery and in turn filed a "State's Demand for Inspection and Notice of Alibi Defense" on November 16th, 2011, and a State's "Notice of Request for Enhanced Punishment" on December 15th, 2011. Additionally, [trial counsel] filed prior to the trial date a "Motion in Limine to Exclude Prior Bad Acts or Criminal Convictions of the Defendant" and "Proposed Jury Instructions." The trial was held on February 1st and 2nd, 2012, and the [petitioner], according to the trial transcript and record, freely, voluntarily and knowingly chose not to testify at his trial in this matter. The written "waiver of right to testify" signed by [the petitioner] on February 2nd, 2012, is part of the Court record.

---

[2]The post-conviction court's letter was incorporated by reference into its Order Denying Petitioner's Petition for Post-Conviction Relief and Amended Petition.

The court concluded that "the advice given and the services rendered by trial counsel were certainly within the range of competence demanded of attorneys representing defendants in criminal cases, and that the [p]etitioner failed to show that his attorney's performance was deficient or that any alleged deficient performance somehow prejudiced the [p]etitioner." We again agree with the findings of the post-conviction court. The record is absent any evidence that trial counsel failed to file "necessary motions" on behalf of the petitioner and the petitioner cannot prove any prejudice as a result.

Though the petitioner alleged numerous deficiencies of counsel on appeal, he failed to address how any of the alleged deficiencies prejudiced the proceedings. This Court is not required to address the strength of the specific deficiencies alleged and we have sufficient grounds to deny the petitioner's claim for post-conviction relief without further analysis. *Strickland*, 466 U.S. at 697; *see also Goad,* 938 S.W.2d at 370. Accordingly, the petitioner has failed to show by clear and convincing evidence that counsels' performance prejudiced the outcome of the proceedings as required by *Strickland. Id.* The petitioner is not entitled to post-conviction relief for his claim of ineffective assistance of counsel.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE

-14-